**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| AIMEE GILES, Independent Administrator of the Estate of MYLES FRAZIER, Decedent, ) ) ) Plaintiff, ) ) v. ) ) POLICE OFFICER DANIEL COLBENSON; ) POLICE OFFICER ORLANDO SANCHEZ JR.; ) and CITY OF CHICAGO, ) ) Defendants. ) | Case No. |

COMPLAINT AT LAW

NOW COMES the Plaintiff, Aimee Giles, Independent Administrator of the Estate of Myles Frazier, Decedent, by and through her attorney, David S. Lipschultz, and complaining of the Defendants, Chicago Police Officer Daniel Colbenson, Star No. 16857; Chicago Police Officer Orlando Sanchez Jr., Star No. 19244; and City of Chicago, states as follows:

JURISDICTION AND VENUE

1. This action is filed pursuant to federal and state law.

2. Pursuant to the United States Constitution and 42 U.S.C. §1983 and §1988 (the Civil Rights Act of 1871), Plaintiff seeks to redress deprivations of the civil rights of her deceased son, Myles Frazier, deprivations accomplished by the Defendants' acts and/or omissions and committed under color of law.

3. Pursuant to the laws of the State of Illinois, Plaintiff seeks damages for wrongful death, constitutional and other legal claims.

4. This Court has jurisdiction pursuant to 28 U.S.C. §1343, §1331 and §1367.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 as the acts at

1

issue in Plaintiff's complaint took place in this judicial district.

## PARTIES

6. The Plaintiff, Aimee Giles (hereinafter "Ms. Giles"), is a resident of Chicago, Illinois. Ms. Giles is the mother of Myles Frazier, who is deceased. Ms. Giles was appointed to serve as the Independent Administrator of the Estate of Myles Frazier in the Circuit Court of Cook County, Probate Division, on March 8, 2021, Case No. 2020 P 06767.

7. Myles Frazier, Decedent (hereinafter "Myles"), was a resident of Chicago, Illinois at the time of his death.

8. Defendant Chicago Police Officer Daniel Colbenson, Star No. 16857 (hereinafter "Officer Colbenson"), is an employee of the Defendant City of Chicago, serving as a police officer. At all times relevant to this Complaint at Law ("Complaint"), Officer Colbenson was acting within the scope of his employment with the City of Chicago and under the color of law.

9. Defendant Chicago Police Officer Orlando Sanchez Jr., Star No. 19244 (hereinafter "Officer Sanchez"), is an employee of the Defendant City of Chicago, serving as a police officer. At all times relevant to this Complaint, Officer Sanchez was acting within the scope of his employment with the City of Chicago and under the color of law.

10. Defendant City of Chicago is a municipal corporation in County of Cook, State of Illinois. At all times relevant to this Complaint, Defendant City of Chicago was the employer and indemnifier of Officer Colbenson and Officer Sanchez (hereinafter "Defendant Officers").

## FACTUAL ALLEGATIONS

<u>Myles Suffered A Mental Health Crisis</u>

11. On the morning of May 22, 2019, Myles, 22 years old, was home his father, Mr. Keith Frazier, at their family house located in the 1300 block of East 61st Street, Chicago,

Illinois.

12. Myles suffered from mental illness, including bipolar disorder.

13. Myles recently had received a court order directing him to appear at a police station on a pending criminal court matter. On the prior evening, Myles and his parents agreed Myles would report to a Chicago Police Department (hereinafter "CPD") district station on the morning of May 22, 2019.

14. When morning came on May 22, 2019, at approximately 10:00 a.m., Mr. Frazier went upstairs to the second floor of his home to speak with Myles about going to the police station.

15. Mr. Frazier observed that Myles was in the throes of a serious mental health crisis. Myles was despondent.

16. Myles informed his father that he had changed his mind and he did not want to go to the police station. Myles and his father agreed that Mr. Frazier would call the police to come to the home to address the warrant and to take Myles to the station if required.

17. Accordingly, Mr. Frazier went downstairs and called the police.

First Responders Patiently Negotiated With Myles, Who Had A Gun

18. Shortly after Mr. Frazier called the police, several uniformed police officers arrived at the house.

19. Mr. Frazier informed the officers that Myles was bipolar, was likely not taking his medications, and that Myles was despondent and in crisis.

20. Mr. Frazier went upstairs to tell Myles that the police officers had arrived.

21. Once upstairs, Mr. Frazier saw that Myles had a gun.

22. Mr. Frazier went downstairs and informed police officers that Myles had a gun.

23. Two police officers positioned themselves at the bottom of the staircase leading up to the second floor.

24. These two officers patiently dedicated approximately thirty minutes speaking with Myles. Myles informed the officers that he was suicidal. The officers urged him to come downstairs so they could help him.

25. Myles refused to come downstairs. However, he continued to speak with the two officers for approximately thirty minutes.

26. Myles shot his gun several times during the thirty minutes.

27. The two officers demonstrated great compassion and professionalism, all the while maintaining safety.

28. The two officers continued to speak with Myles, refusing to give up on him. They continued to encourage Myles to stop shooting the gun and to come downstairs.

29. Due to Myles' mental illness, the two officers were determined to resolve this incident without shooting him.

SWAT Replaced The Negotiating Officers With Myles

30. After approximately thirty minutes passed, a CPD Special Weapons and Tactics ("SWAT") unit arrived at the house and took over command of the incident.

31. SWAT ordered the two officers who had been negotiating with Myles to leave the home.

32. Chicago Police SWAT Officer Daniel Colbenson, Defendant; Chicago Police SWAT Officer Orlando Sanchez Jr., Defendant; and other officers entered the Frazier home.

33. A police officer trained to negotiate with suicidal individuals was present outside the home. SWAT command did not allow this expert to participate in de-escalating the crisis

with Myles.

34. One police officer exiting the house stated that Myles now would not escape alive as SWAT usually ends up shooting people in Myles' circumstances.

35. Soon thereafter, Officer Colbenson and Officer Sanchez fatally shot Myles.

36. Myles died later that day at the University of Chicago Medical Center.

COUNT I
42 U.S.C. § 1983 Excessive Force Claim
Against Officer Colbenson and Officer Sanchez

37. Plaintiff repeats and realleges paragraphs 1 through 36 as if fully set forth herein.

38. The force used by Officer Colbenson and Officer Sanchez against Myles constituted excessive force in violation of his Fourth Amendment Rights of the U.S. Constitution and 42 U.S.C. §1983.

39. The force used by Officer Colbenson and Officer Sanchez against Myles was objectively unreasonable and excessive, and was undertaken intentionally, with malice, and with reckless indifference to the Plaintiff's constitutional rights.

40. The Plaintiff suffered damages.

WHEREFORE, the Plaintiff, Aimee Giles, prays for judgment against the Defendants, Police Officer Daniel Colbenson and Police Officer Orlando Sanchez Jr., for compensatory damages, punitive damages, the costs of the action, attorney's fees pursuant to 42 U.S.C. §1988, and any additional relief this Court deems equitable and just.

COUNT II
42 U.S.C. § 1983 *Monell* Claim
Against City of Chicago

41. Plaintiff repeats and realleges paragraphs 1 through 36 as if fully set forth herein.

42. The actions of Defendants, Officer Colbenson and Officer Sanchez, were taken pursuant to one or more interrelated *de facto* policies, practices and/or customs of the City of Chicago.

43. At all times material to this complaint, the Defendant City had in effect *de facto* policies, practices, and customs which included:

   a. the failure to properly train and supervise Chicago police officers with regard to civilians experiencing symptoms of mental illness;

   b. the encouragement of excessive and unreasonable force against civilians experiencing symptoms of mental illness; and,

   c. the failure to properly train and supervise Chicago police officers with regard to de-escalation tactics and strategies with mentally ill individuals.

44. The United States Justice Department and the U.S. Attorney's Office for the Northern District of Illinois confirmed the existence of said policies, practices and customs in their January 13, 2017 report, based on a one-year investigation of the CPD. Included in the report's findings:

   a. CPD officers engage in a pattern or practice of using force, including deadly force, that is unreasonable;

   b. CPD officers exhibit poor discipline when discharging their weapons and engage in tactics that endanger themselves and public safety, including failing to await backup when they safely could and should do so;

   c. CPD officers use force against people in mental health crisis where force might have been avoided;

   d. CPD's pattern of unlawful conduct is due in part to deficiencies in CPD's training and supervision;

   e. CPD does not provide officers or supervisors with adequate training and does not encourage or facilitate adequate supervision of officers in the field;

   f. "CPD officers do not receive the quality or quantity of training necessary for their jobs. Pre-service Academy training relies on outmoded teaching methods and materials, and does not equip recruits with the skills, knowledge, and

confidence necessary to serve Chicago communities…. The impact of this poor training was apparent when we interviewed recruits who recently graduated from the Academy: only one in six recruits we spoke with came close to properly articulating the legal standard for use of force. Post-Academy field training is equally flawed;" and,

g. CPD officers use unnecessary and unreasonable force in violation of the Constitution with frequency, and that unconstitutional force has been historically tolerated by CPD.

45. Additionally, in April 2016, the Police Accountability Task Force confirmed the existence of the policies, practices and customs at issue in its report, "Police Accountability Task Force Recommendations for Reform: Restoring Trust between the Chicago Police and the Communities They Serve." Included in the report's findings:

a. Once an officer leaves the CPD Training Academy there is virtually no annual, mandated training;

b. "It is critically important that all CPD officers approach each and every citizen encounter with an emphasis on respect and the sanctity of all life. That approach will avoid escalating even the most casual encounter. CPD officers must also seek to de-escalate situations so as to minimize the use of force. Minimizing the use of force not only prevents unnecessary injury and loss of life, it builds police legitimacy and trust;" and,

c. "In 2005, following a series of highly publicized shootings of persons with mental illnesses, CPD established a CIT program to train officers on addressing individuals in mental health crisis. Officers can take a 40-hour course to become CIT certified . . . but only 15% of CPD officers are CIT-certified."

46. Prior to Myles' shooting, Chicago police officers acted in numerous instances in a manner consistent with the policies, practices and customs at issue: unreasonable firing of weapons at persons in mental health crisis. Among those shootings:

a. In 2014 Laquan McDonald was acting erratically, armed with a knife but was walking away from the officers, when he was shot at 16 times and killed by a Chicago police officer;

7

    b. On December 26, 2015, a Chicago police officer shot and killed Quintonio LeGrier, a college student, and Bettie Jones, a neighbor who opened the door for police. LeGrier, who had a history of mental illness, called 911 three times that night for help concerning a fight with his father and police responded when his father called and reported LeGrier was threatening him with a baseball bat; and,

    c. These and many other shootings involving the mentally come, of course, in the larger context of police misconduct in Chicago: CPD officers shot and killed 70 people between 2010 and 2014 – the most fatal shootings of any police department in the top 10 most populous cities in the country.

47. Additionally, the City of Chicago's failure to properly hire, train, supervise, discipline, monitor, control, counsel and/or transfer the Defendant Officers was also done with deliberate indifference. These failures likewise acted as direct and proximate causes of the injuries to Myles and his Estate.

48. These policies, practices and customs encouraged the unreasonable shooting of civilians with mental health disabilities, and were the moving force and a direct and proximate cause of the unconstitutional acts committed by the Defendant Officers, and a direct and proximate cause of the injuries sustained by Myles and his Estate.

WHEREFORE, the Plaintiff, Aimee Giles, prays for judgment against the Defendant, City of Chicago, for compensatory damages, punitive damages, the costs of the action, attorney's fees pursuant to 42 U.S.C. §1988, and any additional relief this Court deems equitable and just.

COUNT III
Illinois Wrongful Death Act Claim
Against City Of Chicago

49. Plaintiff repeats and realleges paragraphs 1 through 36 as if fully set forth herein.

50. This claim is asserted pursuant to the Illinois Wrongful Death Act, 740 ILCS 180.

51. The wrongful death action arises due to the willful and wanton misconduct of the Defendant City of Chicago, and its agents and employees.

52. Defendant City of Chicago, and its agents and employees, had various duties in their interaction with Myles, including but not limited to:

    a. a duty in their interaction with Myles to exercise care consistent with the CPD policies, orders, and training addressing interaction with mentally ill suspects with weapons;

    b. a duty to refrain from escalating the crisis at issue and by using more force than was necessary at the time of the shooting;

    c. a duty to not withdraw from the negotiation the very two officers who were building rapport with Myles for 30 minutes prior to SWAT's arrival;

    d. a duty to consult with the Chicago police negotiator on scene who could have contributed expertise, experience and information towards a possible less-violent outcome of the incident; and,

    e. a duty to refrain from willful and wanton conduct in their interaction with Myles.

53. City of Chicago, and its agents and employees, violated these and other duties by acting in reckless disregard for the safety of Myles by abandoning negotiations and assigning SWAT to intervene and to shoot Myles.

54. Defendant City of Chicago, and its agents and employees, engaged in a course of action which showed an utter indifference to or conscious disregard for Myles' safety and welfare.

55. It was clear these acts, naturally and probably, would result in injury to Myles.

56. Defendant City of Chicago, and its agents and employees, recklessly or consciously disregarded the probability of causing severe physical injury to Myles.

57. Plaintiff claims City of Chicago, and its agents and employees, escalated the dangers that led to Myles' death.

58. As a proximate result of one or more of the aforesaid intentional and/or willful and wanton acts, Myles sustained injuries which resulted in his death.

59. As a proximate result of one or more of the aforesaid intentional and/or willful and wanton acts, Myles' next of kin have suffered and, in the future will suffer, damages as a proximate result of the Defendant City of Chicago's conduct.

60. The conduct of City of Chicago, and its agents and employees, proximately caused Myles' death and caused his heirs to lose his companionship, society, love, affection, and to suffer pecuniary loss.

WHEREFORE, the Plaintiff, Aimee Giles, prays for judgment against the Defendant, City of Chicago, for compensatory damages, all damages available to Plaintiff pursuant to the Wrongful Death Act, the costs of the action, and any additional relief this Court deems equitable and just.

## COUNT IV
### Survival Act: Willful Wanton Infliction of Emotional Distress
### Against City Of Chicago

61. Plaintiff repeats and realleges paragraphs 1 through 36 as if fully set forth herein.

62. Plaintiff Precious Stovall brings this claim as Administrator of the Estate of Sincere Ash, pursuant to the Illinois Survival Act, 755 ILCS 5/27-6 ("Survival Act").

63. As a proximate result of one or more of the aforesaid intentional and/or willful and wanton acts and/or omissions, Myles, prior to his death, suffered serious physical and emotional injuries, pain and suffering of a personal and pecuniary nature.

64. Pursuant to the provisions of the Survival Act, Defendant City of Chicago is subject to liability for Myles' injuries and damages.

65. Had Myles survived, he would have been entitled to bring this action for damages. This action survives him.

WHEREFORE, the Plaintiff, Aimee Giles, prays for judgment against the Defendant,

City of Chicago, for compensatory damages, punitive damages, plus the costs of the action and any additional relief this Court deems equitable and just.

## COUNT V
### Illinois Family Expense Act
### Against City Of Chicago

66. Plaintiff repeats and realleges paragraphs 1 through 36 as if fully set forth herein.

67. As a direct and proximate result of the aforementioned acts of the City of Chicago, and its agents and employees, the Estate of Myles Frazier sustained losses for funeral and burial expenses and seeks compensation pursuant to the Illinois Family Expense Act, 750 ILCS 65/15.

WHEREFORE, Plaintiff prays for a judgment against the City of Chicago in an amount necessary to fully and fairly compensate the Estate for all losses compensable under the terms of the Illinois Family Expense Act, plus costs.

## COUNT VI
### *Respondeat Superior*
### Against City Of Chicago

68. Plaintiff repeats and realleges paragraphs 1 through 36 as if fully set forth herein.

69. The state law violations cited herein were committed by Defendant Officer Colbenson and Officer Sanchez in the scope of their employment as police officers of the City of Chicago.

70. As a result of the unlawful actions of Defendant Officer Colbenson and Officer Sanchez, the Plaintiff was injured

71. The Defendant City of Chicago, as principal, is liable for the actions of its agents, Officer Colbenson and Officer Sanchez, pursuant to the doctrine of *respondeat superior* for the claims set forth in this action.

WHEREFORE, should Officer Colbenson and/or Officer Sanchez be found liable for the acts alleged above, Defendant City of Chicago would be liable to pay the Plaintiff any judgment and damages obtained against the Defendant Officers.

COUNT VII
Indemnification/State Law Claim
Against Defendant City of Chicago

72. Plaintiff repeats and realleges paragraphs 1 through 36 as if fully set forth herein.

73. Illinois law, 745 ILCS 10/9-102, provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

74. At all times relevant to this incident, Defendants, Officer Colbenson and Officer Sanchez, were employees of the City of Chicago, and they acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, should Officer Colbenson and/or Officer Sanchez be found liable for the acts alleged above, Defendant City of Chicago would be liable to pay the Plaintiff any judgment and damages obtained against the Defendant Officers.

JURY DEMAND

The Plaintiff requests a trial by jury.

Respectfully submitted,

AIMEE GILES, Independent Administrator

/s/ David S. Lipschultz

David S. Lipschultz
Atty No. 6277910
Law Offices of David S. Lipschultz, Inc.
200 S. Michigan Avenue, Suite 201
Chicago, Illinois 60604
Telephone: 312-414-1778
Email: david@dsllawoffice.com